UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| LARRY ELAM, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) Case No. 4:06CV1142 CDP |
| | ) |
| MICHAEL NEIDORFF, et al., | ) |
| | ) |
| Defendants. | ) |

# MEMORANDUM AND ORDER

Plaintiffs are investors who purchased stock of Centene Corporation during a three-month period in 2006 when, they allege, Centene's stock price was artificially inflated because of false statements made by Centene and its officers. Defendants have filed a motion to dismiss, arguing that plaintiffs' complaint does not meet the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995. Under the statute plaintiffs must plead (1) why the statements were false or misleading at the time they were made and (2) particularized facts giving rise to a "strong inference" that the defendants acted with fraudulent intent (scienter) when they made the statements. I agree with defendants that plaintiffs have not met the heavy pleading standard required by the act, and so I will grant the motion to dismiss.

## Legal Standards

In 1995, Congress enacted the Private Securities Litigation Reform Act to remedy perceived abuses in securities class-action litigation. See Tellabs, Inc. v. Makor Issues & Right, Ltd., No. 06-484, 2007 WL 1773208 (June 21, 2007). Among other changes, the PSLRA set out two heightened pleading requirements for cases alleging securities fraud. The complaint must: (1) specify each false statement or misleading omission and explain why the omission was misleading; and (2) state with particularity facts giving rise to a "strong inference" that the defendant acted with the scienter required for the cause of action. Id.; In re Navarre Corp. Sec. Litig., 299 F.3d 735, 741-42 (8th Cir. 2002); 15 U.S.C. § 78u-4(b)(1)-(2).

The first of these requirements cannot be met simply by alleging that defendants made statements "and then showing in hindsight that the statement is false." Navarre, 299 F.3d at 743. Instead, the plaintiff must allege facts that show *why* the disputed statement was untrue when it was made. In re K-tel International, Inc. Securities Litigation, 300 F.3d 881, 891 (8th Cir. 2002). "Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them." Id.

Tellabs, decided just last week, was concerned with the second of these

requirements – the pleading standards for scienter. It directed a court facing a motion to dismiss to: (1) accept all factual allegations in the complaint as true; (2) consider the complaint in its entirety, including any documents incorporated into the complaint by reference; and (3) "consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." Tellabs, at * 10. A complaint can survive "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id.

## Allegations of the Complaint

Plaintiffs allege three sets of statements that they say falsely overstated the company's financial position, and that they say caused them to purchase stock at artificially high prices. Those statements were made on April 25, 2006; June 6, 2006; and June 20, 2006; they related to the company's first quarter earnings and expected second quarter performance. On July 18, 2006, Centene announced that its second quarter earnings would be substantially lower than expected and the stock price declined almost fifty percent. Plaintiffs' proposed class covers persons who bought stock during this period between April 25 and July 18, 2006. The defendants are the company itself, and three individual officers: Chairman and CEO Michael Neidorff; Senior Vice President and Chief Financial Officer J. Per

Brolin; and Senior Vice President and Chief Executive of Health Plan Business Karey L. Witty, who was Chief Financial Officer until April 24, 2006.

Centene provides health care services, either directly or by contracting with other organizations, to people covered by Medicaid and related programs. It gets paid by Medicaid, and so its profitability depends on its ability to manage medical costs. In reporting its quarterly earnings, it includes not only the costs incurred and billed during the quarter, but also an estimate of medical costs that have been incurred but not reported (IBNR). IBNR is an estimate of claims liability, because some medical events occur before the end of a given reporting period (and Centene is therefore liable to pay them), but they have not yet been formally billed to the company. The company regularly reports its Health Benefits Ratio (HBR), which represents medical costs, including IBNR, as a percentage of premiums. Plaintiffs allege that the HBR for any given period is an important measure of how the company is doing financially, and that it was materially understated in the relevant time period.

On April 25 Centene issued a 10-Q for the first quarter of 2006 as well as a press statement. Both of these documents were positive and in line with analyst estimates. Centene reported net earnings of $8.8 million, or $.20 per diluted share for the first quarter of 2006. As required by the Sarbanes-Oxley Act, Niedorff and

Witty certified that the financial statements were fairly presented. On June 6, 2006, Centene hosted an investor day where Centene's management reiterated its guidance for the second quarter. That day Wachovia Securities reported that Centene's management had stated that first quarter medical cost trends were improving in Indiana and Ohio. On June 20, 2006, CEO Neidorff discussed ongoing cost pressures and stated that he wasn't commenting on guidance, while noting that Centene doesn't comment on guidance unless there is a material change. Niedorff stated that they were not projecting anything "devastating" and that there were no "big issues" that he was worried about.

On July 18, 2006, Centene announced that its second quarter earnings would be substantially lower than expected, in part because of an adjustment of approximately $9.7 million for additional medical costs primarily related to March 2006 in Indiana and Texas. According to plaintiffs, this amount should have been included in IBNR for the first quarter, so the first quarter reported earnings figure $8.8 million was false, and Centene should have reported a loss of about $900,000 for the first quarter. After Centene's announcement, share prices dropped to $13.60 a share, a decline of almost 50 percent.

Centene had previously made representations about its business model. In its 2005 10-K, Centene stated, "The combination of our decentralized local

approach to operating our subsidiaries and our centralized finance, information systems and claims processing allows us to quickly and economically integrate new business opportunities in both our Medical Managed Care and Specialty Services segments." Centene had also issued a response to a request for information filed by the state of Tennessee that indicated that Centene tracks inpatient admissions and that Centene had the ability to "successfully integrate claims, enrollee and provider data into a single repository by applying a series of clinical rules and algorithms that automatically convert raw data into statistically meaningful information."

Neidorff and Witty had 10b5-1 automatic trading plans. Under a 10b5-1 automatic trading plan, executives may sell shares without triggering insider trading charges. The plans lay out the dates or prices at which trades will be made in advance and give up control of the trades to a broker. Neidorff and Witty had plans that allowed them to sell shares when the price of Centene stock was over $25 a share. On April 27, 2006 and April 28, 2006, Neidorff sold $40,000 shares of his personal holdings of Centene common stock at $25.21 and $25.35 per share under his 10b5-1 automatic trading plan. On April 28, Witty sold 5,000 shares at $25 under his 10b5-1 automatic trading plan.

**Discussion**

1. <u>Allegations of Falsity</u>

Plaintiffs allege that the first quarter 10-Q and accompanying earnings release and Neidorff's June 6, 2006 and June 20, 2006 statements were false.[1] As discussed above, the PSLRA requires that plaintiffs "set forth, as part of the circumstances constituting fraud, an explanation as to why the disputed statement was untrue or misleading *when made*." K-tel, 300 F.3d at 891 (emphasis in the original).

In an attempt to meet this standard, plaintiffs argue that because Centene represented in other documents that it carefully monitored medical costs as they were incurred, Centene must have known about the additional $9.7 million of first quarter IBNR. They point to Centene's response to the Tennessee request for information and to Centene's earlier statements that it had state of the art monitoring, utilization and control systems. They also rely on Centene's Managed Health Service manual for Indiana, which states that "prior authorization" is required for expensive injectable medication and for special care nursery and NICU level care. Plaintiffs argue that state of the art monitoring systems would

---

[1] The complaint also alleges that defendants manipulated and backdated options, but plaintiffs have now abandoned those claims.

mean that Centene had available all the information it needed to know all of its costs and IBNR. They argue that since prior authorization was required for certain services, Centene must have been on notice that its IBNR was going to be higher than reported. Defendants, in turn, point to numerous statements in the same documents warning that IBNR numbers were estimates only and that if those estimates turned out to be inaccurate, earnings could be affected.

Plaintiffs also allege that Neidorff's statements to investors on June 6 and June 20 were also false when made. They rely on the same arguments as those regarding the quarterly earnings – because Centene touts its ability to predict and manage its costs, Neidorff must have known that the results were far worse than he was reporting.

These allegations are insufficient to show that Centene's statements were false when made. By their very nature, IBNR cost estimates are estimates – the actual costs are unknown. Defendants note that plaintiffs have not challenged the methodology Centene used to make those estimates, nor have they argued that defendants deviated in any way from that methodology. Plaintiffs have not presented anything that would show that the known information was not used to create the IBNR estimates. Indeed, plaintiffs have acknowledged that the IBNR medical cost estimates had been approved by Centene's internal and external

actuaries. Additionally, even if Centene knew that services had been initiated (such as knowing that someone had gone into the hospital or that a baby had been admitted to the NICU), that does not mean that it had some way of knowing the length of service or the full cost of service, other than the clinical rules and algorithms that Centene used to create the estimates. As a result, plaintiffs have not adequately plead that defendants made statements that were false when made.

    2.    <u>Allegations of Scienter</u>

Plaintiffs must allege facts that give rise to a reasonable and strong inference of scienter. To meet this "strong inference" requirement, "an inference of scienter must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." <u>Tellabs</u> at *10. Plaintiffs have filed a supplement to their opposition, arguing that their complaint survives under the <u>Tellabs</u> decision, and defendants have filed a response arguing the opposite. I do not believe that the <u>Tellabs</u> decision is much different from the Eighth Circuit law that existed before. The vast majority of the Eighth Circuit decisions might just as well have been decided under the "at least as compelling" standard. One Eighth Circuit case, <u>Florida State Board of Admin. v. Green Tree Financial Corp.</u>, 270 F.3d 645 (8th Cir. 2001), cited the stricter "most plausible of competing inferences" standard, but that case found the higher

standard had been met. The cases finding that the allegations of scienter were insufficient appear to have used a less stringent standard, and the Eighth Circuit specifically stated that it had not adopted the higher standard despite its citation in Green Tree. See K-tel, 300 F.3d at 889, n. 6. In any event, I will, of course, apply the Tellabs standards, but I am still guided by the pre-existing Eighth Circuit cases to the extent the are consistent with Tellabs.

Determining whether a complaint alleges facts giving rise to a "strong inference" of scienter is not a matter of determining whether the plaintiff has effectively used inflammatory language in his complaint. If that were the test, this one would surely survive. Unfortunately for plaintiffs, many of their inflammatory allegations – when stripped of the hyperbole – do not support an inference of wrongdoing. For example, paragraph 3, which covers a page and a half, alleges a stock option manipulation scheme, but plaintiffs have now completely abandoned the allegation that options were backdated or otherwise fraudulently manipulated.

The same paragraph describes the 10b5-1 automatic selling program as a method for manipulating stock sales:

> The scheme allowed Company insiders to manipulate their sales under an "automatic selling program" purportedly adopted December 15, 2005. Under this program, CEO Neidorff, who traditionally derived a substantial portion of his income through the sale of Centene shares, was selling shares approximately every two months:

> for example, sales were automatically effectuated in February 2006 and April 2006. . . . During this time, after the April 2006 insider sales were done, Neidorff halted his "automatic" sales program.

At the hearing plaintiff conceded that the automatic selling program was – in fact and not just purportedly – adopted December 15. It provided for automatic sales on certain dates if the stock price was above $25. The only sales ever made under the program were the two listed as "examples," in February and April 2006. There were no later sales not because defendants halted the program, but because the stock price never again reached the $25 mark.

Plaintiffs have not alleged any facts that would show that the trades were unusual. The Eighth Circuit has held that insider trading complaints "must allege more than that the defendant benefitted from trading because of a false statement or misleading omission; the insider trades have to be 'unusual,' either in the amount of profit made, the amount of stock traded, the portion of stockholdings sold, or the number of insiders involved." Navarre, 299 F.3d at 747. When plaintiffs fail to allege the prior history of sales for the defendants or even the number of shares held by each, a strong inference of scienter cannot be found based on insider trading. K-tel, 300 F.3d at 896. In this case, plaintiffs have not alleged any facts about Neidorff and Witty's prior history of trading or the number of shares they owned.

Plaintiffs raise three arguments in their opposition brief about scienter. First, they argue that defendants' publication of materially misleading statements while in possession of conflicting information supports a strong inference of scienter. See Green Tree, 270 F.3d at 665. While it is true that such a fact pattern could give rise to a strong inference of scienter, plaintiffs have not actually alleged any facts that show defendants were in possession of conflicting information. Plaintiffs again rely on defendants' touted ability to access its providers' client volume and claims payment patterns. Centene tracks client data by applying a series of clinical rules and algorithms that automatically convert raw data into statistically meaningful information. Plaintiffs have not alleged that any of Centene's calculations were actually in contrast with the statements. Further, plaintiffs have not alleged that Centene's calculation methods were improper in any way.

Plaintiffs argue that because medical costs were at the core of Centene's business, knowledge may be imputed to defendants about changes in those costs. The cases that they cite for this proposition are not persuasive here, in part because they involved circumstances much more suggestive of direct access to this information. See In re Ancor Communications, Inc., 22 F. Supp.2d 999, 1005 (D. Minn. 1998) (imputing knowledge of potential incompatibility between two of the

company's computer products involving the most significant contract in the company's history) (citing Epstein v. Itron, Inc., 993 F. Supp. 1314, 1325-26 (E.D. Wash. 1998)); In re Campbell Soup Co., 145 F. Supp 2d 574, 599 (D.N.J. 2001); In re Tel-Save Sec. Lit., 1999WL 999427, at * 5 (E.D. Pa. Oct. 19, 1999); Danis v. USN Communications, Inc., 73 F. Supp. 2d 923, 939 (N.D. Ill. 1999); In re Aetna Inc. Sec. Lit., 34 F. Supp. 2d 935, 953 (E.D. Pa. 1999). This argument ignores the requirement of PSLRA that private securities plaintiffs must plead "in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." In re Silicon Graphics, 183 F.3d 970, 974 (9th Cir. 1999) (rejecting the approach endorsed by Epstein v. Itron, Inc., 993 F. Supp. 1314 (E.D. Wash. 1998)). The Eighth Circuit has rejected similar arguments regarding scienter where there was no evidence that the defendants had actual access to the information relied upon by the plaintiffs, even though the plaintiffs asserted that it would have a large effect on the core business of the company. Kushner v. Beverly Enterprises, Inc., 317 F.3d 820, 828 (8th Cir. 2003). Therefore, the mere fact that medical costs were a core part of Centene's business does not give rise to a strong inference of scienter.

Plaintiffs' final argument is that the temporal proximity of the alleged misrepresentations and subsequent revelation of the truth is circumstantial

evidence that the statements were false when made and that defendants knew they were false. See Cooper v. Pickett, 137F.3d 616, 625-26 (9th Cir. 1998) (decided prior to PSLRA); see also In re Xcel Energy, Inc., Sec., Derivative & "ERISA" Litig., 286 F. Supp. 2d 1047, 1057 (D. Minn. 2003) (finding scienter on other grounds); In re Grand Casinos, Inc. Sec. Litig., 988 F. Supp. 1273, 1276 (D. Minn. 1997) (finding a strong inference of scienter where insider trading was unusual and where multi-million dollar cost overruns and other difficulties could not have come to light all at once). This argument has some appeal. I am sympathetic to plaintiffs' suspicions that Neidorff *must* have known more than he was saying when he spoke on June 20. But this is really no more than speculation. Temporal proximity may give rise to suspicion, but I do not believe it gives rise to a reasonable inference. See Fidel v. Farley, 392 F.3d 220, 232 (6th Cir. 2004); Ronconi v. Larkin, 253 F.3d 423, 437 (9th Cir. 2001); Yourish v. California Amplifier, 191 F.3d 983, 997 (9th Cir. 1999); In re Nash Finch, Co., 2007 WL 126658 at *20 (D. Minn. May 1, 2007). When all the allegations are taken together, the reasonable inferences showing bad motive are not as compelling as those showing innocent behavior. Plaintiffs have not met the "strong inference" requirement.

## **Conclusion**

Although plaintiffs have alleged facts that show in hindsight that defendants were wrong about the IBNR medical cost estimates, plaintiffs have failed to meet either of the requirements of the PSLRA. Before the passage of the PSLRA these allegations may well have survived a motion to dismiss, but Congress decided that it wanted to protect businesses from these suits unless plaintiffs could articulate, before undertaking any discovery, facts explaining why statements were false when made and facts providing a strong inference of scienter. While plaintiffs have shown things that are suspicious, Congress has stated that more is required, and Tellabs makes clear that the court must weigh the competing inferences to determine if the case can survive a motion to dismiss.[2] While it is conceivable that plaintiffs are correct, the PSLRA does not allow suits to go forward based on a mere possibility. Here, after comparing the reasonable inferences showing and detracting from scienter, I conclude that plaintiff's arguments are not "cogent and at least as compelling as" the inferences of nonfraudulent intent.

Accordingly,

---

[2] Justice Stevens, in his dissent in Tellabs, argued for a probable cause standard. I believe the allegations made here would not pass that standard either, because plaintiffs' allegations, when stripped of the inflammatory rhetoric, do not show that it is more probable than not that defendants acted with the necessary intent.

**IT IS HEREBY ORDERED** that defendants' motion to dismiss [#27] is granted and this case is dismissed.

A separate judgment is entered this same date.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 29th day of June, 2007.